J-A08030-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2998 EDA 2023 |

Appeal from the Order Entered October 25, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000377-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: C.J.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2999 EDA 2023 |

Appeal from the Decree Entered October 25, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000311-2023

BEFORE:  BOWES, J., OLSON, J., and McLAUGHLIN, J.

MEMORANDUM BY OLSON, J.:                    **FILED APRIL 04, 2024**

In this consolidated appeal,[1] Appellant, J.C., ("Father") appeals from the

October 25, 2023 decree entered in the Court of Common Pleas of Philadelphia

County at trial court docket number CP-51-AP-0000311-2023 ("Case

---

[1] In a January 10, 2024 *per curiam* order, this Court consolidated *sua sponte* the appeals filed with this Court at docket numbers 2998 EDA 2023 and 2999 EDA 2023.

311-2023") that terminated his parental rights to his dependent child, C.J.C., a male child born January 2017, ("the Child") pursuant to section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101 - 2938.[2] Additionally, Father appeals from the October 25, 2023 order entered in the Court of Common Pleas of Philadelphia County at trial court docket number CP-51-DP-0000377-2020 ("Case 377-2020") that granted a motion filed by the Philadelphia Department of Human Servies ("DHS") to change the permanency goal of the Child from reunification to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. §§ 6301 – 6375. We affirm the decree involuntarily terminating Father's parental rights and, therefore, dismiss Father's appeal filed at 2998 EDA 2023 as moot.

The record demonstrates that, on August 18, 2023, DHS filed a petition for involuntary termination of Father's parental rights pursuant to Sections 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b) of the Adoption Act. That same day, DHS also filed a petition to change the Child's placement goal from one of reunification with Father to adoption.[3] Carla Beggin, Esquire was appointed as guardian *ad litem* ("GAL") to represent the best interests of the Child. Bernadette Perkins, Esquire was appointed as legal counsel to represent the

_____

[2] We note that in the caption of the appeal filed at 2998 EDA 2023, the minor child is identified as "C.C." but in the caption of the appeal filed at 2999 EDA 2023, the same minor child is identified as "C.J.C." For purpose of identification, we refer to the minor child as "C.J.C."

[3] The Child's biological mother, J.G., ("Mother") died on April 7, 2021.

legal interests of the Child.[4]  Scott Gessner, Esquire was appointed to represent Father.  On October 25, 2023, the trial court conducted a hearing on the termination petition and the petition for goal change.  Father attended the hearing.

On October 25, 2023, the trial court found that DHS met its burden of proof under Sections 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b) of the Adoption Act, and subsequently terminated Father's parental rights to the Child.  On that same day, the trial court also granted DHS's request to change the permanent placement goal to one of adoption with regard to the Child. This appeal followed.[5]

Father raises the following issues for our review:

1. Did the trial court err in terminating [Father's] parental rights because [DHS] failed to establish by clear and convincing evidence that [Father] cannot or will not be able to remedy the incapacity and conditions which led to [the Child's] removal and by finding that there would be no irreparable harm to [the Child?]

---

[4] Neither Attorney Beggin or Attorney Perkins filed a brief with this Court. However, we note that, during the hearing, both the GAL and the Child's legal counsel joined with DHS and concluded the Child would be harmed if removed from his foster parents' home. N.T., 10/25/23, at 45-48.

[5] Father filed separate concise statements of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i), along with separate notices of appeal at each of the aforementioned trial court dockets on November 23, 2023.  The trial court filed its Rule 1925(a) opinion on December 5, 2023, stating that it relied upon its statement, appearing on pages 50 and 51 of the October 25, 2023 hearing transcript, to support the termination of Father's parental rights to the Child and the change in the permanent placement goal to one of adoption.

[2.] Did the trial court err in changing the [permanent placement] goal to [one of] adoption where the record shows that [Father] substantially complied with the family service plan and that he made progress towards alleviating the circumstances which necessitated the original placement[?]

Father's Brief (Case 311-2023) at 3 (Issue 1); *see also* Father's Brief (Case 377-2020) at 3 (Issue 2).

Father's first issue challenges the trial court's termination of his parental rights pursuant to Section 2511 of the Adoption Act. In matters involving the termination of parental rights, our standard of review is well-settled.

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill[-]will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (original brackets omitted). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted). "If competent evidence supports the trial court's findings, we will

- 4 -

affirm even if the record could also support the opposite result." *In re B.J.Z.*, 207 A.3d 914, 921 (Pa. Super. 2019) (citation omitted).

The termination of parental rights is guided by Section 2511 of the Adoption Act, which requires a bifurcated analysis of the grounds for termination followed by an assessment of the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the [trial] court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the [trial] court determines that the parent's conduct warrants termination of his or her parental rights does the [trial] court engage in the second part of the analysis pursuant to Section 2511(b)[ - ]determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*B.J.Z.*, 207 A.3d at 921 (citation omitted). We have defined clear and convincing evidence as that which is "so clear, direct, weighty, and convincing as to enable the trier[-]of[-]fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re Z.P.*, 994 A.2d 1108, 1116 (Pa. Super. 2010) (citation omitted). A child has a right to a stable, safe, and healthy environment in which to grow, and the "child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re I.J.*, 972 A.2d 5, 9 (Pa. Super. 2009).

Here, the trial court terminated Father's parental rights to the child pursuant to Sections 2511(a)(1), (a)(2), (a)(5), and (a)(8). Section 2511(a) provides, in pertinent part, as follows:

### § 2511. Grounds for involuntary termination

**(a)** **General rule.** - The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect[,] or refusal of the parent has caused the child to be without essential parental care, control[,] or subsistence necessary for his[, or her,] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect[,] or refusal cannot or will not be remedied by the parent.

. . .

(5) The child has been removed from the care of the parent by the [trial] court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time[,] and termination of the parental rights would best serve the needs and welfare of the child.

. . .

(8) The child has been removed from the care of the parent by the [trial] court or under a voluntary agreement with an agency, 12 months or more have

> elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist[,] and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. §§ 2511(a)(1), (a)(2), (a)(5), and (a)(8).

Once the trial court determines that involuntary termination of parental rights is warranted under Section 2511(a), the trial court is required to engage in an analysis pursuant to Section 2511(b) to determine whether termination is in the best interests of the child. Section 2511(b) states,

### § 2511. Grounds for involuntary termination

. . .

**(b) Other considerations.** - The court in terminating the rights of a parent shall give primary consideration to the developmental, physical[,] and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing[,] and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6)[,] or (8), the [trial] court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

Thus, in determining whether termination is in the child's best interest, Section 2511(b) requires a trial court to "give primary consideration to the developmental, physical[,] and emotional needs and welfare of the child." *Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023). The emotional needs and welfare of a child include intangibles such as love, comfort, security, and

- 7 -

stability. *Id.* at 1106. Under Section 2511(b), the primary focus is on the child, and the trial court must consider all three categories of needs and welfare. *Id.* at 1105 (stating, the trial court "should consider the matter from the child's perspective, placing [the child's] developmental, physical[,] and emotional needs and welfare above concerns for the parent").

A child's developmental, physical, and emotional needs and welfare are to be determined on a case-by-case basis. *Id.* While not an exhaustive list, a trial court, in determining whether to grant or deny termination, is required, at a minimum, to consider the following factors as part of a Section 2511(b) analysis: (1) whether the child is in a pre-adoptive home; (2) whether the child has a bond with the foster parent/family; (3) whether the child has a bond with the biological parent who is the subject of the termination proceeding; and (4) whether termination of the biological parent-child bond, if any, would destroy an existing necessary and beneficial relationship.

In considering the bonds a child may have, if any, with his or her foster parent and biological parent, the trial court must examine the intangibles the child derives from the respective relationships, including love, comfort, security, permanency, and stability. *Id.* at 1111. "[S]everance of a necessary and beneficial relationship is the kind of loss that would predictably cause extreme emotional consequences or significant, irreparable harm" to the child. *Id.* at 1109-1111 (original quotation marks omitted). As such, a tightly bonded relationship that would preclude termination requires more than a showing that severance will have an adverse or detrimental impact on the

child. *Id.* In other words, termination should not be denied solely because of an emotional bond and potential adverse effects from termination. *Id.* at 1109 n.22. "[C]ourts must determine whether the trauma caused by breaking the parent-child bond is outweighed by the benefit of moving the child toward a permanent home." *Id.* at 1107 (citation and original brackets omitted). "[C]ourts [must] refine their focus on the child's development and mental and emotional health rather than considering only the child's 'feelings' or 'affection' for the [biological] parent[.]" *Id.* at 1111 (stating, "courts may weigh the child's feelings and affection towards a [biological] parent, **relative to all** [his or] her developmental, physical, and emotional needs and welfare" (emphasis in original)).

A trial court may rely on a caseworker or social worker to determine the status of and nature of a parent-child bond. *In re Adoption of J.N.M.*, 177 A.3d 937, 944 (Pa. Super. 2018) (holding, a trial court "is not required by statute or precedent to order a formal bonding evaluation be performed by an expert" (citation omitted)), *appeal denied*, 183 A.3d 979 (Pa. 2018).

It is well-established that this Court need only agree with the trial court as to any one section of Section 2511(a), as well as Section 2511(b), in order to affirm a decree involuntarily terminating parental rights. *Interest of M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022), *relying on In re B.L.W.*, 843 A.2d 380 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Our review of the certified record confirms that DHS introduced clear and

convincing evidence in support of termination pursuant to Section 2511(a)(8)

and Section 2511(b).

> To terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. 23 Pa.C.S.A. § 2511(a)(8). Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the [child's] removal by the [trial] court. Once the 12-month period has been established, the [trial] court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of [DHS] supplied over a realistic time period. Termination under Section 2511(a)(8) does not require the [trial] court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of [DHS] services.

*In re C.B.*, 230 A.3d 341, 348 (Pa. Super. 2020) (case citations, quotation marks, and original brackets omitted), *appeal denied*, 234 A.3d 410 (Pa. 2020). "Under Section 2511(a)(8), in determining whether the conditions that led to removal and placement continue to exist, the relevant inquiry in this regard is whether the conditions that led to removal have been remedied and[,] thus[,] whether reunification of parent and child is imminent at the time of the hearing." *C.B.*, 230 A.3d at 348-349 (citation, original quotation marks, and original brackets omitted).

> With respect to the "needs and welfare" analysis pertinent to Sections 2511(a)(8) and (b), we have observed:
>
> > Initially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child. However, Section 2511(a)(8)

explicitly requires an evaluation of the "needs and welfare of the child" prior to proceeding to Section 2511(b), which focuses on the "developmental, physical[,] and emotional needs and welfare of the child." Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a [trial] court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a [trial] court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of the child, as pr[e]scribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*Id.* at 349 (citation, original brackets, and some quotation marks omitted).

In the case *sub judice*, the trial court explained its reasons for terminating Father's parental rights to the Child pursuant to Sections 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b) as follows:[6]

The testimony reflects that [the Child] was placed pursuant to an order of protective custody [] in March, 2020. He's been in the same foster home since he was placed there [more than three years ago].

Testimony reflects that single case plan objectives were established for a reunification, and that [Father] attended approximately four of those single case plan meetings, and

---

[6] Although our decision to affirm the termination of Father's parental rights rests upon Section 2511(a)(8) and Section 2511(b), we incorporate the entirety of the trial court's findings pertaining to all the provisions in Section 2511(a) because of the substantial overlap between these statutory provisions and the elements of Section 2511(a)(8).

- 11 -

therefore was aware of his single case plan objectives that included attending [the Achieving Reunification Center ("ARC")] for anger management, employment, [and] parenting [counseling], and that he successfully completed ARC. He was to have random drug screens, attend the [Clinical Evaluation Unit ("CEU")] for an evaluation[] and behavioral health services, [and] provide proof of employment, housing, and substance use.

The testimony reflects that while [Father] did complete some of his objectives, throughout the case[,] he's been minimally compliant and has made minimal progress. For months[,] unfortunately[, Father's] whereabouts were unknown. They [became] unknown, and during those times he neither visited nor contacted [the Community Umbrella Agency ("CUA")] regarding [the Child. W]hile the CUA case manager testified that at time[s Father] was in a shelter or was hospitalized, [Father] clarified that he wasn't hospitalized but had appointments, and during those times he did not reach out regarding [the Child].

The one home assessment that took place showed that the housing was not appropriate for reunification. [The trial court does not] currently have proof regarding whether the current housing is appropriate for reunification. While the testimony reflects that the visits [between Father and the Child] go well, they remain supervised at [CUA]. And[,] unfortunately[,] attempts to have community visits were unsuccessful.

While there's a relationship, the testimony does not reflect that there's evidence [the Child has] a strong parental bond with [Father. The trial court does not] find that termination would destroy an existing, necessary[,] or beneficial relationship, nor would termination cause irreparable harm to [the Child]. In fact, the testimony was that if [the Child] were removed [from his foster home,] it would be detrimental to him.

[The trial court is] in receipt of [Father's] exhibits F-1[,] as well as F-2. Both exhibits reflect efforts that were made after the goal change [and] termination petitions were filed. [The trial court finds] that the [Child] has a strong bond with his current foster parents. They're providing him with love, care, and support, and are meeting all of his needs. [The trial court finds] that it is in [the Child's] best interest for the goal to be changed to adoption and [the] parental rights of [Father] and any unknown putative father to be terminated[.]

N.T., 10/25/23, at 50-51.

A review of the record demonstrates that on March 10, 2020, the Child was placed in the care and custody of DHS after the trial court issued an order of protective custody for the Child, based upon allegations that on March 9, 2020, "Mother and Father [were] found in [the] home, high on K2[, a synthetic cannabinoid, and the h]ome [was] in deplorable condition with stolen utilities and little food." **See** Application for Order of Protective Custody, 3/10/20; **see also** Trial Court Order of Protective Custody, 3/10/20. The Child was adjudicated dependent on October 9, 2020.

The Child continued to be in placement when DHS filed a petition for involuntary termination of Father's parental rights on August 18, 2023. Thus at the time the termination petition was filed, the Child had been removed from Father's parental care for more than 12 months. 23 Pa.C.S.A. § 2511(a)(8); **see also C.B.**, 230 A.3d at 348.

With a goal of reunification, Father's case plan objectives included: completion of a dual diagnosis for any mental health disorder or substance abuse disorder; submission to three random drug tests; enrollment in a drug and alcohol program; completion of parenting and housing counseling provided by ARC; completion of anger management counseling with ARC or a similar agency; execution of all necessary releases pertaining to the Child; submission of proof of employment; participation in a home assessment; and attendance at weekly visitation with the Child. Trial Court Order, 10/9/20; **see also** Trial Court Order, 9/20/21; N.T., 10/25/23, at 14-15.

- 13 -

A CUA case manager described Father's progress toward meeting his case plan objections and alleviating the circumstances that brought the Child under DHS care and custody as "minimal – definitely minimal." *Id.* at 22. The case manager testified that Father completed parenting, housing, employment, and anger management counseling. *Id.* at 18-19. Father has not, however, provided the case manager proof that he engaged in drug and alcohol treatment, and Father refused to undergo a behavioral health services evaluation. *Id.* at 18. The case manager stated that Father attended less than half of his random drug tests. *Id.* at 15. The case manager expressed that there have always been concerns over Father's drug use and sobriety throughout the life of the case because drug use was one of the factors which precipitated the Child's placement. *Id.* at 22, 24. Father admitted to using and selling phencyclidine, commonly referred to as "PCP," as recently as September 2022. *Id.* at 23.

The case manager testified that Father has never refused to sign any consent forms but that, ultimately, Father has only signed one consent form. *Id.* at 16. The case manager explained that Father "has just always been sometimes hard to locate" and that Father's location is unknown for months at a time (*i.e.*, June 2022, to August 2022,) and until Father contacts the case manager. *Id.* at 16-17. Father has made attempts to attend supervised visitation with the Child except for the periods where Father's whereabouts were unknown. *Id.* at 20.

Father has twice provided proof of employment from two separate employers but is no longer employed by either employer. Although the case manager was able to complete a home assessment in 2021, Father is no longer living at that residence, and the case manager has been unable to verify that Father has "stable housing" for the "last year and a half." *Id.* at 26.

The case manager described the Child's relationship with the foster parents as a "very strong parental bond," in which the Child addresses the foster parents as "mom" and "dad." *Id.* at 10. The foster parents provide for all of the Child's basic needs, including providing love, care, support, and nurture to the Child, while, according to the case manager, Father does not provide any of the Child's basic needs. *Id.* at 10-11. The case manager stated that he does not have any concerns about the welfare of the Child in the foster home and recommended that the foster parents be permitted to adopt the Child. *Id.* at 12. When asked, the case manager stated that the Child would not suffer irreparable harm if Father's parental rights were terminated. *Id.* at 22. In so concluding, the case manager explained that although the Child expressed a desire to have contact with Father, the Child has not stated that he wants to live with Father but, rather, has expressed that he would like to remain with the foster parents. *Id.* at 13, 22. The case manager stated that the Child interacts well with the foster parents, and it would be detrimental to the Child if the Child were removed from the foster home. *Id.* at 22, 25.

Father testified that he has been employed by a construction company since June 2023. *Id.* at 32. Father explained that his current employment prevents him from attending random drug tests. *Id.* at 37-38. Father stated that he is currently living with his sister, but "also [has] a room [that he] rent[s] for when [he] want[s] to have company, like female company" because his sister does not allow him to have guests at her home. *Id.* at 33-34. Father explained that, at his sister's house, he utilizes the room that "is basically like the master bedroom" and that if reunification occurred, Father would be able to erect a partition in the bedroom so that the Child would have "his own little private room setting[.]"[7] *Id.* at 35. A home assessment of the sister's residence, however, has not been performed. *Id.* at 26, 34.

Father admitted that he used PCP "last year sometime, around the same time [he] gave the positive urine" test for drug use. *Id.* Father testified that he received services from the NorthEast Treatment Center ("NET"), including drug and alcohol, mental health, and anger management counseling, and received drug and alcohol treatment from January 2023, to July 2023. *Id.* at 35-36, 38. The case manager described the services provided by NET as follows:

> [I]t's like a group that he goes to. It's not intense treatment where [counselors] can get to the root of the problem because there's still the inconsistencies with [Father's] random [drug tests. T]here's still the inconsistencies with living conditions. So there's

---

[7] The parties stipulated that Father's sister would permit Father and the Child to live with her, if reunification occurred. N.T., 10/25/23, at 43.

just things that behaviorally and emotionally just don't [] show stability. And so, this group, although [Father] has been going off and on for some time now, it hasn't changed his circumstances of where he is presently.

*Id.* at 27-28. NET eventually "dropped" Father from their services rooster as of July 2023, because Father missed 30 consecutive days of attendance. *Id.* at 38. Father stated that at one point, when he felt his sobriety was "overbearing" he was placed in a drug and alcohol treatment program for 21 days. *Id.* at 36.

Upon review, we concur with the trial court, and the record supports, that the conditions which led to the removal and placement of the Child continued to exist despite the reasonable good faith efforts by DHS. 23 Pa.C.S.A. § 2511(a)(8); *see also C.B.*, 230 A.3d at 348. While Father completed parenting, housing, and anger management counseling and signed at least one release form pertaining to the Child, Father has not completed a dual diagnosis for mental health disorders and substance abuse disorders or enrolled in a drug and alcohol treatment program. Although we respect Father's participation in the NET program for the purpose of maintaining his sobriety, as noted by the case manager, this program lacks the intensity of a drug and alcohol treatment program or an individualized counseling arrangement that would aid Father in overcoming the issues that led to the Child's placement and establish the stability necessary for reunification. Moreover, the record is replete with episodes demonstrating that Father has not summoned the resolve to ameliorate the drug- and housing-related causes

and conditions that lead to the Child's removal and placement. For example, Father cited his current employment as preventing him from submitting to the required three random drug tests and stated that he "had an appointment" which prevented a home assessment of his current living conditions. *Id.* at 34, 37-38. Finally, although Father does participate in visitations with the Child, those visitations remain supervised at the CUA facility and have been interrupted periodically by Father's disappearances and loss of contact with CUA and, more importantly, with the Child. As such, we concur with the trial court, and the record supports, that Father has made "minimal progress" towards overcoming the conditions and obstacles which led to the removal and placement of the Child.

We also concur with the trial court, and the record supports, that termination of Father's parental rights would best serve the needs and welfare of the Child, as analyzed under Section 2511(a)(8). The Child is in need of parental "love, care, and support," as noted by the trial court, and a safe environment in which to grow. Father has not completed his dual diagnosis for any mental health disorders or substance abuse disorders, has failed to submit to random drug tests, has not undergone a home assessment of his current living arrangements, admits to relapsing into drug use in 2022, and has not enrolled in an appropriate drug and alcohol treatment program. Moreover, Father's visitation with the Child has been limited to supervised weekly visitations, when Father decides to be available. A child's life, and the need for parental love, comfort, security, and stability, should not be held in

abeyance while a parent summons the abilities, desire, and prioritization to overcome the obstacles that prevent reunification. *See I.J.*, 972 A.2d at 9; *see also In re McCray's Adoption*, 331 A.2d 652, 656 (Pa. 1975) (stating the long-held position that, "[p]arental rights may not be preserved by merely waiting for some convenient time for the performance of parental duties and responsibilities while others adequately provide the child with [his or] her immediate and continuing physical and emotional needs" (ellipses and parentheses omitted)).

In examining the effects termination of Father's parental rights would have on the Child, as well as the best interests of the Child pursuant to Section 2511(b), the trial court noted that the Child had a "strong bond" with the foster parents, who provide the Child with love, care, and support and meet all the Child's basic needs. *Id.* at 51. Moreover, the trial court heard testimony that, if given the opportunity, the foster parents wished to adopt the Child, and the case manager recommended that adoption be permitted based upon his observation and interaction with the Child, the foster parents, and Father. *Id.* at 12. Conversely, the trial court found that the bond between Father and Child, although existing, was not "a strong parental bond." *Id.* at 51. In examining the effects that termination of Father's parental rights would have on the Child, the trial court held that termination would not destroy an existing necessary and beneficial relationship between Father and the Child and would not cause the Child to suffer irreparable harm. *Id.*

Upon review, we concur with the trial court, and the record supports, that termination of Father's parental rights is in the best interests of the Child pursuant to Section 2511(b). The record demonstrates that the Child looks to the foster parents to fulfill his daily, basic needs and for care, love, support, and stability, and does not look to Father to provide such needs. The Child refers to his foster parents as "mom" and "dad" and has asked to remain in the foster home. While the Child does seek to retain a relationship with Father, the Child has not expressed a desire to return to Father's residence.

For these reasons, we concur with the trial court, and the record supports, that DHS has proven by clear and convincing evidence that grounds for termination of Father's parental rights exist under Section 2511 (a)(8) and (b). Consequently, we discern no error of law or abuse of discretion in the decree terminating Father's parental rights to the Child.

In his second issue, Father challenges the trial court order changing the permanent placement goal to one of adoption with regard to the Child. Father's Brief (Case 377-2020) at 7. Father asserts that the trial court abused its discretion in entering the October 25, 2023 order changing the permanent placement goal to one of adoption because "the record shows that [Father] substantially complied with the service plan developed for the [Child] and that [Father] has made progress towards alleviating the circumstances which necessitated the original placement." *Id.* Because we conclude that the trial court did not abuse its discretion in terminating Father's parental rights to the Child, as discussed *supra*, Father's issue pertaining to the change of the

permanent placement goal to one of adoption is moot. *See In re Adoption of A.H.*, 247 A.3d 439, 446 (Pa. Super. 2021) (stating, "the effect of [this Court's] decision to affirm the [trial] court's termination decree necessarily renders moot the [trial] court's decision to change [the permanent placement] goal to adoption"), *appeal denied*, 258 A.3d 1144 (Pa. 2021); *see also Interest of A.R.*, ___ A.3d ___, 2023 WL 8226326, at *7 (Pa. Super. 2023) (slip opinion) (stating, because "the trial court did not abuse its discretion in granting the petition to terminate [] parental rights, [a challenge to the change of the permanent placement goal] is moot"); *Interest of D.R.-W*, 227 A.3d 905, 917 (Pa. Super. 2020) (reiterating that, "[a]n issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect" (original quotation marks omitted)). As such, we dismiss Father's appeal filed with this Court at 2998 EDA 2023 as moot.[8]

_____

[8] Assuming *arguendo*, that Father's appeal filed at 2998 EDA 2023 was not subject to dismissal as moot, we would conclude that Father is not entitled to relief. We review a goal-change order for an abuse of discretion. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). As such, we are required to "accept the trial court's findings of fact and credibility determinations if the record supports them, but we need not accept the [trial] court's inferences or conclusions of law." *D.R.-W*, 227 A.3d at 917 (citation omitted).

As discussed *supra*, the Child has been in placement for more than three years and is currently living with a foster family who provides the Child with his basic needs, as well as love, care, safety, and stability, and wishes to adopt the Child. While the record supports that Father achieved some of the objectives necessary for reunification, the record also supports that Father continues to struggle at achieving the remaining reunification objectives despite the assistance provided by DHS and the passage of time. The Child cannot be expected to place his future on hold while Father summons the ability to get

- 21 -

Decree affirmed (2999 EDA 2023). Appeal dismissed as moot (2998 EDA 2023).

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/4/2024

---

his life in order. As such, we could concur with the trial court, and the record supports, that a change in the permanent placement goal to one of adoption is in the best interests of the Child.